UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| DOUG WALKER, and | ) | Case No. 11-52059-659 |
| CARMEN WALKER, | ) | Judge Kathy A. Surratt-States |
| | ) | Chapter 7 |
| Debtors. | ) | |
| | ) | |
| SAILOR MUSIC, et. al., | ) | **Adversary No. 12-4013-659** |
| | ) | |
| | ) | **PUBLISHED** |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| DOUG WALKER, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The matter before the Court is the Complaint to Determine Dischargeability of Debt and Answer of Defendant Doug Walker to Complaint to Determine Dischargeability of Debt.  A trial was held on August 27, 2013, at which Plaintiffs appeared by counsel, Debtor Doug Walker appeared by counsel and in person and the parties presented testimony and argument.  The matter was then taken under submission.  Upon consideration of the record as a whole, the Court enters the following **FINDINGS OF FACTS**:

Plaintiffs Sailor Music, Controversy Music, Innocent Bystander, Write Treatage Music, Universal-Polygram International Publishing, Inc. and Hideout Records and Distributors, Inc. (Gear Publishing Division) (hereinafter "Plaintiffs") are members of the American Society of Composers, Authors and Publishers (hereinafter "ASCAP").  ASCAP is a performing rights licensing organization that issues licenses to perform songs in the ASCAP repertoire on behalf of its members.  As such, ASCAP is a professional membership organization of song writers, composers and music publishers.  ASCAP's mission is to license and promote the music of its members and foreign

affiliates, obtain fair compensation for the public performance of their works and to distribute the royalties that ASCAP collects based upon those performances.  Plaintiffs granted ASCAP a nonexclusive right to license public performance rights of Plaintiffs' compositions.

Debtor Doug Walker a/k/a Douglas Walker (hereinafter "Debtor") is currently a high school physical education, art and literacy teacher and is also a football and track and field coach.  Prior to employment as a teacher, Debtor was self-employed, prior to which he was the Executive Director of Head First Foundation which educates children on how to prevent head injuries.

Debtor was the managing member of Twister's Iron Horse Saloon, L.C. located at 1045 Main Street, Imperial, MO (hereinafter "Twister's").  Twister's is a restaurant-bar that operates as a place of public entertainment, amusement and refreshments.  Twister's is open to the public, Monday through Saturday from 11 a.m. to 1:30 a.m., and 11 a.m. to 12:00 a.m. on Sundays. Debtor testified that he was in charge of day-to-day operations of Twister's in that he arrived every week day morning at approximately 7 a.m. and typically worked until 3:00 p.m. as well as working the occasional weekend.  In this capacity, Debtor got the cash registers prepared for the day, made bank deposits and made sure Twister's was adequately stocked with both food and beverages.

Debtor also permitted music that is included in the ASCAP repertoire to be publicly performed at Twister's without a license from ASCAP as required by federal copyright law.  From May 2006 through at least September 2009, Debtor was offered public performance licenses by ASCAP representatives in person,[1] by mail[2] and repeated attempts were made by ASCAP to

---

[1]Exhibits 16 and 26 report at least two in person attempts by ASCAP representative Mary Johnes to contact Debtor at Twister's to discuss the requirement of a public performance license under copyright law.

[2]Exhibits 1 - 14 comprise written correspondence from ASCAP to Debtor in which the reason that public performance licenses are required by law is explained and a proposed public performance license is enclosed for Debtor to execute and return with the appropriate payment.

contact Debtor by telephone for the same purpose.[3]  The uncontroverted evidence demonstrates that at least 14 letters were sent to Debtor's attention at Twister's and at least 28 attempts were made by ASCAP to contact Debtor telephonically from June 16, 2006 through January 30, 2008. These telephone calls were made on different days of the week at varied times of day, as early as 9:49 a.m. and as late as 10:14 p.m.  This public performance license would have permitted the authorized public performance of ASCAP members' copyrighted material at Twister's.

Russell R. McGuire (hereinafter "Mr. McGuire"), Director of Licensing at ASCAP, testified to the following.  ASCAP has a returned mail process whereby all returned mail would be sent to the main office of ASCAP[4] and none of the mail correspondence sent to Debtor at Twister's was returned.[5]  ASCAP obtained the address for Twister's from two publicly available sources: the Missouri Secretary of State database and the Alcohol Beverage Licensing, both of which listed 1045 Main Street, Imperial, MO as the address for Twister's.  No other address was listed.  The address where all mail correspondence was sent by ASCAP to Debtor is also the address where ASCAP representative Mary Johnes visited in person.

Debtor testified that he only received mail for Twister's at a P.O. Box and he does not recall ever receiving any mail from ASCAP at the P.O. Box, nor does he recall receiving mail from ASCAP at Twister's.  Debtor testified that in addition to Twister's, he had other businesses and used the same P.O. Box as a mail collection box for all of his businesses.  Debtor admits that he has received mail that was addressed to Debtor at 1045 Main Street, Imperial MO, the Twister's address, but delivered to the P.O. Box.

---

[3]Exhibits 15, 17-25 represent at least 28 separate phone calls made by an ASCAP representative to Twister's in attempt to contact Debtor from June 16, 2006 through January 30, 2008.

[4]Mr. McGuire testified that at the relevant time, ASCAP's main office was in Atlanta, GA however it is now located in Nashville, TN.

[5] Mr. McGuire testified that no mail was sent to the registered agent of Twister's because that was not ASCAP's process in that ASCAP may use the registered agent of a company for service of process only.

Debtor further testified that he does not recall ever speaking with any ASCAP representative over the telephone or speaking with his staff about telephone messages from representatives of ASCAP. Debtor stated that it was not unusual for his staff to fail to deliver telephone messages and in fact, at times, even customers would answer the phone at Twister's. For this reason, Debtor testified that he has never answered the phone and denied his identity to the caller, in part, because he wanted to teach his staff proper telephone etiquette.

On July 15, 2009, ASCAP sent a third-party investigator to Twister's. The investigator arrived at 7:17 p.m. at which time 25 patrons were present, and left at 11:17 p.m. at which time 118 patrons were present.[6] Twister's has a total capacity of 140 patrons.

That evening, patrons were entertained by a disk jockey, the jukebox and karaoke. The investigator took notes of all songs that were performed during the time the investigator was in Twister's. At least four (4) unauthorized performances of Plaintiffs' copyrighted material took place in Twister's in the investigator's presence. There was also an unlicensed jukebox in Twister's which is not directly the subject of any dispute before the Court.[7] Debtor testified that a vendor supplied the jukebox and other games in Twister's for which all proceeds derived therefrom were split 30% to Twister's and 70% to the vendor for the jukebox and split 50% to Twister's and 50% to the vendor for the games. Debtor testified that it was his understanding that the jukebox proceeds were not split 50% to Twister's and 50% to the vendor and rather were split 30% to Twister's and 70% to the vendor because the vendor was required to pay royalties. Debtor testified that he understood

---

[6]Exhibit 27.

[7]The presence of the jukebox is somewhat relevant because the licensing fee calculated by ASCAP is in part based on the size of the establishment, the amount of copyrighted material performed and the mechanism of the performances of the copyrighted material which includes whether the performance is by jukebox whether licensed or unlicensed, live band, radio, television screen or other audio-visual devices, etc. Mr. McGuire testified that generally, there is a separate procedure for obtaining a jukebox license through the Jukebox License Office, which operates parallel to ASCAP in that if an ASCAP representative discovers an unlicensed jukebox in a public place, ASCAP will charge a licensing fee for the jukebox which will be removed if the proprietor of the jukebox obtains a license from the Jukebox License Office. *See* Ex. 1, page 6, Statement of Operating Policy for Twister's Iron Bar Saloon.

the term "royalties" to mean that something was being paid to either someone who wrote a song or performed a song.

In a letter dated September 17, 2009, the Manager of Litigation Services for ASCAP sent Debtor a settlement offer after informing Debtor of the findings of ASCAP's third-party investigator.[8] The letter was sent to Debtor at the Twister's address by United States Postal Service – certified mail, return receipt requested.[9]  The return receipt states that the date of delivery is September 23, 2009 and is signed by Debtor.[10]  Debtor admits that the return receipt bears his signature.  Debtor did not accept ASCAP's settlement offer.

On June 21, 2010, Plaintiffs brought an action for copyright infringement against Debtor and Twister's in the United States District Court for the Eastern District of Missouri (hereinafter "District Court" or "District Court Case").  After several unseized opportunities to comply with discovery obligations, on May 31, 2011, the District Court entered a Default Judgement as to liability as a sanction for Debtor's willful failure to comply with discovery.  On August 3, 2011, a Memorandum and Order was entered by the District Court on Plaintiffs' Motion for Default Judgment and for Final Judgement against Debtor and Twister's, jointly and severally, in the total amount of $41,231.90 (hereinafter "Judgment") for Debtor's violation of federal copyright law, specifically Sections 504 and 505 of Title 17.[11]

On November 16, 2011, Debtor filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code.  Debtor claims at least a 50% ownership interest in Twister's on Debtor's Schedule B.

---

[8]Ex. 14.

[9]Ex. 29.

[10]Ex. 29.

[11]The United States District Court for the Eastern District of Missouri awarded statutory damages of $7,000.00 per infringement for a sum of $28,000.00, plus $12,649.50 in attorney's fees in connection with the District Court case and costs of $582.40, for a total of $41,231.90. *See Sailor Music v. Twister's Iron Horse Saloon, L.C.,* 2011 WL 3349816 * 3 (E.D. Mo. 2011).

-5-

Debtor seeks to discharge his debt to Plaintiffs.

Plaintiffs seek a determination that the Judgment should be excepted from discharge under Section 523(a)(6) because Debtor's actions were willful and malicious within the meaning of Section 523(a)(6).  Debtor denies that his conduct was willful and malicious in that Debtor testified that he does not recall receipt of any correspondence from Plaintiffs nor did Debtor intend to harm Plaintiffs and therefore his actions cannot be willful or malicious.  Alternatively, Debtor argues that even if he received the letter dated September 17, 2009, receipt of this letter would serve as Debtor's first notice – albeit constructive notice because Debtor testified that he does not recall ever receiving or reading this letter – of Debtor and Twister's copyright infringement and therefore any act to perform copyrighted material after this date would be willful and malicious.  As such, because the investigator's July 15, 2009 visit preceded this September 17, 2009 letter, Debtor argues that Plaintiffs' allegations are insufficient for Plaintiffs to meet their heightened burden under Section 523(a)(6).

## JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding under 28 U.S.C. §§ 151, 157, and 1334 (2012) and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. §157(b)(2)(I) (2012). Venue is proper in this District under 28 U.S.C. § 1409(a) (2012).

## CONCLUSIONS OF LAW

The Court must determine whether the debt owed by Debtor to Plaintiffs should be excepted from discharge under Section 523(a)(6).[12]  The Court rules as follows.

Debts arising from willful and malicious injury by a debtor are excepted from discharge

---

[12]At the outset, the Court notes that the time to dispute the amount of the Judgment, to the inclusion of whether jukebox fees were properly included, is gone.  Neither Debtor nor Twister's appealed the judgment of the District Court.

-6-

under Section 523(a)(6). 11 U.S.C. § 523(a)(6) (2012). "The bankruptcy court's determination of whether a party acted willfully and maliciously inherently involves inquiry into and finding of intent, which is a question of fact." *In re Fors,* 259 B.R. 131, 135 (B.A.P. 8th Cir. 2001) (citing *Waugh v. Eldridge (In re Waugh),* 95 F.3d 706, 710 (8th Cir. 1996)). Willfulness and maliciousness are two distinct elements of Section 523(a)(6). *In re Patch*, 526 F.3d 1176, 1180 (8th Cir. 2008) (citing *In re Scarborough,* 171 F.3d 638, 641(8th Cir. 1999), *cert. denied,* 528 U.S. 931, 120 S.Ct. 330, 145 L.Ed.2d 258 (1999)). The Eighth Circuit Court of Appeals has set a high bar for certainty of harm regarding willful and maliciousness for the purposes of Section 523(a)(6). *In re Adams*, 349 B.R. 199, 203 (Bankr. W.D. Mo. 2006) (citing *In re Hartley,* 869 F.2d 394, 394 (8th Cir. 1989) (citations omitted)).

It is the burden of the bankruptcy court, as the trier of fact, to assess the sufficiency of the evidence and the credibility of witnesses. *See In re Interco Inc.,* 211 B.R. 667, 682 (Bankr. E.D. Mo. 1997). The bankruptcy court's assessment of the credibility of witnesses is entitled to great weight. *In re Barber,* 95 B.R. 684, 688 n.14 (Bankr. W.D. Mo. 1988); *see generally* Fed. R. Bankr. P. 8013. "[A] bankruptcy court's disbelief of a debtor/defendant's testimony in a section 523(a)(6) matter properly can be used to support a finding that the debtor acted maliciously" as well as willfully. *See In re Fors,* 259 B.R. at 140 (citing *In re Topakas,* 202 B.R. 850, 852, 862 (Bankr. E.D. Pa. 1996)). To prove willfulness, the creditor must show by a preponderance of the evidence that the debtor intended the injury, not just a deliberate or intentional act leading to injury. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998); *Grogan v. Garner,* 498 U.S. 279, 280, 111 S.Ct. 654, 655, 112 L.Ed.2d 755 (1991). "If the debtor knows that the consequences are certain, or substantially certain, to result from his conduct, the debtor is treated as if he had, in fact, desired to produce those consequences." *In re Patch,* 526 F.3d at 1180. "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v.*

*Geiger,* 523 U.S. at 61, 118 S.Ct. at 977 (emphasis in original).  Debts arising from recklessly or negligently inflicted injuries do not fall within the compass of Section 523(a)(6). *Kawaauhau,* 523 U.S. at 64, 118 S.Ct. at 978.

To prove malice, the creditor must prove the debtor's conduct was specifically targeted at the creditor and was certain or almost certain to cause financial harm. *In re Madsen,* 195 F.3d 988, 989 (8th Cir. 1999) (citing *Barclays American/Business Credit, Inc. v. Long (In re Long),* 774 F.2d 875, 881 (8th Cir. 1985)); *American Bank of Raytown v. McCune (In re McCune),* 85 B.R. 834, 836 (Bankr. W.D. Mo. 1988).  "A wrongful act is malicious if . . . there exists a 'knowing wrongfulness or knowing disregard for the rights of another.'" *In re Fors,* 259 B.R. at 137 (citing *Erickson v. Roehrich (In re Roehrich),* 169 B.R. 941, 945 (Bankr. D.N.D. 1994)). "An act may be found to be malicious even in the absence of a specific, subjective intent to injure." *Id.*  The conduct must "be more culpable than that which is in reckless disregard of creditors' economic interests and expectancies, as distinguished from mere legal rights.  Moreover, knowledge that legal rights are being violated is insufficient to establish malice, absent some additional 'aggravated circum-stances'...." *First Federal Bank v. Mulder (In re Mulder),* 306 B.R. 265, 270 (Bankr. N.D. Iowa 2004) (citations omitted).

Proof of copyright infringement is not necessarily sufficient to prove willful and malicious-ness under Section 523(a)(6). *Broadcast Music, Inc. v. Elms (In re Elms),* 112 B.R. 148, 151 (Bankr. E.D. La. 1990).  A violation of federal copyright law can be regarded as an aggravating factor in a bankruptcy court's Section 523(a)(6) determination. *Id.* (citing *Broadcast Music, Inc. v. Gabaldon (In re Gabaldon),* 55 B.R. 431, 433 (Bankr. D.N.M. 1985)).   A court may also consider whether a debtor intentionally ignores correspondence which advises the debtor of his copyright infringement and legal obligations forthwith and view such actions as evidence of a willingness to voluntarily inflict injury. *See In re Gabaldon,* 55 B.R. at 433 (citation omitted); *see generally Nick-O-Val Music Co., Inc. v. P.O.S. Radio, Inc.,* 656 F. Supp. 826, 829 (M.D. Fla. 1987) ("Defendants knew of their

-8-

license fee delinquencies, and knew or should have known that their ASCAP licenses had been revoked ... Yet, Defendants deliberately ignored this knowledge, as well as ASCAP's attempts at renegotiation and reconciliation, and [continued to perform] the copyrighted musical compositions without proper licensing or other valid permission. This uncontroverted evidence is sufficient to sustain a finding that Defendants acted willfully.") To prove willfulness, the plaintiff must prove that the debtor was aware or should have been aware of his actions in contravention of copyright law and the debtor's legal obligations to the copyright owner. *See Matter of Remick,* 98 B.R. 935, 941 (Bankr. W.D. Mo. 1987) (where the court determined that the debtor could not act in a way that was certain or almost certain to cause financial harm until the debtor read a letter which included an unambiguous directive that the debtor stop playing unlicensed copyrighted compositions). "It is permissible for a bankruptcy court to consider circumstantial evidence that a debtor violated a relevant statute, along with other pertinent evidence, when making a factual determination regarding malicious intent." *In re Fors,* 259 B.R. at 139; *see also Knight Kitchen Music v. Pineau (In re Pineau),* 149 B.R. 239, 244-45 (D. Me. 1993) (citations omitted) (where violation of federal copyright law was deemed an aggravating factor in the court's Section 523(a)(6) factual determination of the debtor's voluntary willingness to inflict injury).

The record is clear that Plaintiffs attempted to contact Debtor at least 28 times by telephone from June 16, 2006 through January 30, 2008. These phone calls were on various days of the week and at various times of day, as early as 9:49 a.m. and as late as 10:14 p.m. Yet, Debtor, the manager and at least 50% owner of Twister's, was allegedly never in Twister's at any of the 28 times that a representative of ASCAP called to speak with him. This, after Debtor testified that he was in charge of the day-to-day operations at Twister's and typically worked from 7 a.m. to 3 p.m., in addition to the occasional weekend. At least 14 separate letters were sent by Plaintiffs to Debtor at Twister's in which Debtor was informed of his legal obligation to purchase a license from ASCAP, yet, Debtor testified that he does not recall receiving any of these letters, either at Twister's or at

-9-

Debtor's P.O. Box, though Debtor admits that on occasion he has received mail sent to his attention at Twister's in the P.O. Box.  None of the mail sent by ASCAP to Debtor at the Twister's address was returned to ASCAP.  Debtor does not deny that his signature appears on the receipt of the certified mail sent to Debtor's attention at Twister's, though he testified that he does not recall receiving or reading this letter.  Plaintiffs also attempted to contact Debtor in person at Twister's at least twice.  The Court concludes that Debtor's testimony that he never received any of the messages[13] from ASCAP nor did he receive or read any of the letters or 'could not recall' whether he received and read any of the letters from ASCAP is simply not credible.

Rather, this Court concludes that Debtor was in fact aware of his legal obligation to obtain an ASCAP license for the public performances of copyrighted material in Twister's but he chose not to.  As previously stated, none of the at least 14 letters sent to Debtor's attention at Twister's were returned to ASCAP as undelivered.  The overwhelming evidence compels the conclusion that Debtor received the several ASCAP letters, either directly at Twister's or at Debtor's P.O. Box. Debtor admits that he has received mail addressed to him at 1045 Main Street, Imperial, MO, the Twister's address, but delivered to the P.O. Box and therefore, the Court accepts this as a possibility.  Moreover, Debtor testified that he understands the concept of royalties and that payment is due to the author or performer of a song and in fact, agreed to a split where 30% of the jukebox proceeds went to Twister's and 70% of the proceeds went to the vendor of the jukebox for this very reason in that Debtor was made to believe that the vendor received a greater portion of jukebox proceeds because the vendor would have to pay royalties to someone who either wrote or performed a song.  Further, Twister's was a restaurant-bar and therefore, Debtor's copyright infringement contributed to the ambiance of Twister's and served as a source of entertainment for the patrons which ultimately contributed to Debtor and Twister's financial gain, at the expense of

---

[13] Debtor's testimony that he never denied his identity to a caller – particularly an ASCAP representative – for want to teach his staff proper telephone etiquette strains credulity.

-10-

Plaintiffs.  The uncontroverted evidence shows that on July 15, 2009, when Plaintiffs' investigator entered Twister's at 7:17 p.m., there were only 25 patrons present, however, when the investigator left at 11:17 p.m., there were 118 patrons; the capacity of Twister's was 140.  That night, Twister's offered karaoke entertainment in addition to music which was played from a jukebox and a disk jockey.  Unauthorized performances of at least four (4) of Plaintiffs' copyrighted material contributed to the entertainment of Twister's patrons.

Therefore, the Court concludes that by a preponderance of the evidence, Debtor's failure to proactively obtain an ASCAP license, and then intentionally ignore ASCAP's several attempts to communicate with Debtor regarding the same, was willful.  Debtor knew the consequences of his failure to obtain a license and failure to heed the several contacts by ASCAP – that royalties due to authors of songs would not be paid – would cause financial harm to both ASCAP and ASCAP's constituents generally, but Plaintiffs particularly.  Debtor's actions were willful.

This Court previously declined to grant Plaintiffs' Motion for Summary Judgement on the basis that there was insufficient evidence for this Court to make any determination of malice.  *See In re Walker,* 477 B.R. 111 (Bankr. E.D. Mo. 2012).  The Court now concludes that Debtor's actions rise above the requisite level of malice and thus, by a preponderance of the evidence, Debtor acted maliciously within the meaning accorded to Section 523(a)(6) in the Eighth Circuit.

Debtor had both the duty and ability as the at least 50% owner of Twister's to supervise, halt or remedy the copyright infringing conduct.  Moreover, Debtor gained financially from the unauthorized use of Plaintiffs' copyrighted material.  Thus, Debtor knowingly disregarded the rights of Plaintiffs under copyright law.  Moreover, Debtor was aware of his general obligation to obtain a license from ASCAP, but in any event, as an owner and proprietor of Twister's which includes public performances of copyrighted material as a matter of course in its operations, it was Debtor's duty to know and comply with federal copyright law.  Debtor admits to knowledge of copyright law and royalties due to authors of copyrighted material.  Debtor's conduct demonstrates that Debtor

-11-

knew that his failure to pay for an ASCAP license would financially harm Plaintiffs.  These facts are compounded by this Court's conclusion that Debtor intentionally ignored ASCAP's correspondence and thwarted ASCAP's attempts to contact Debtor telephonically.  Additionally, there can be no dispute that Debtor violated federal copyright law, specifically Sections 504 and 505 of Title 17, which serves as an aggravating factor in this Court's determination as to malice.  Therefore, the Court does not conclude that to meet the requisite level of maliciousness, Debtor must subjectively intend to harm each specific author of the songs performed.  Rather, the Court looks at all of the aggravating factors that surround Debtor's conduct since ASCAP's first attempt to contact Debtor. Debtor's actions show blatant disregard for the rights of ASCAP's constituents and federal copyright law.  Debtor's actions were malicious.[14]  Therefore, by separate Order, the Judgement entered by the United States District Court for the Eastern District of Missouri in the amount of $41,231.90 in favor of Plaintiffs and against Twister's and Debtor, jointly and severally pursuant Sections 504 and 505 of Title 17, will be excepted from discharge in Debtor's case and Plaintiffs' request for costs will be denied.

_Kathy A. Surratt - States_

KATHY A. SURRATT-STATES
Chief United States Bankruptcy Judge

DATED:  April 18, 2014
St. Louis, Missouri

---

[14]Alternatively, this Court would have concluded that the record is sufficient for a finding of implied malice in that Debtor intentionally disregarded his legal duty to comply with federal copyright law and obtain a public performance license, Debtor ignored and thwarted all attempts by ASCAP to assist Debtor in complying with the same and Debtor wanted to profit from the use of Plaintiffs' copyrighted material without paying Plaintiffs what they were owed by paying the ASCAP licensing fee.  *See In re Pineau,* 149 B.R. at 243 (where the district court determined that debtor's choice not to pay for a license prior to broadcasting songs on debtor's radio station was sufficient for a finding of implied malice).

Copies to:

Office of the United States Trustee
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO  63102

Sailor Music
231 S. Bemiston, Ste 1220
Clayton, MO 63105

Spencer P. Desai
Desai Eggmann Mason LLC
Pierre Laclede Center
7733 Forsyth Boulevard, Suite 2075
St. Louis, MO 63105

Rachel A Jeep
Copeland Thompson Farris PC
231 S. Bemiston
Suite 1220
Clayton, MO 63105

Thomas H. Riske
Desai Eggmann Mason LLC
7733 Forsyth Blvd., Suite 2075
Clayton, MO 63105

Danielle A. Suberi
Desai Eggmann Mason LLC
7733 Forsyth Blvd.
Suite 2075
Saint Louis, MO 63139

Controversy Music
231 S. Bemiston, Ste 1220
Clayton, MO 63105

Innocent Bystander
231 S. Bemiston, Ste 1220
Clayton, MO 63105

Write Treatage Music
231 S. Bemiston, Ste 1220
Clayton, MO 63105

Universal Polygram International Publishing, Inc.
231 S. Bemiston, Ste 1220
Clayton, MO 63105

Hideout Records and Distributors, Inc.
(Gear Publishing Division)
c/o Stephen C. Hiotis
231 S. Bemiston, Ste. 1220
Clayton, MO 63105

Doug Walker
P.O. Box 129
Imperial, MO 63052